**GROVE HOLDING CORP.,
et al., Plaintiffs,**

v.

**FIRST WISCONSIN NATIONAL BANK
OF SHEBOYGAN, n/k/a Firstar National Bank of Sheboygan, Defendant.**

No. 91–C–96.

United States District Court,
E.D. Wisconsin.

March 24, 1998.

L. William Staudenmaier, Cook & Franke, Milwaukee, WI, for plaintiff.

Chris J. Trebatoski, Michael, Best & Friedrich, Milwaukee, WI, Quarles & Brady, Milwaukee, WI, for defendant.

## DECISION AND ORDER

WARREN, District Judge.

Now before the Court are two post-trial motions filed by defendant: a Motion for Judgment as a Matter of Law Under Rule 50(b) and a Rule 59 Motion for a New Trial. For the reasons that follow, both motions are denied.

This case arises out of several transactions culminating in the sale of the Kasson cheese manufacturing company to plaintiff Grove Holding. The individual plaintiffs owned shares in Grove Holding and guaranteed some of Grove Holding's debts with defendant Firstar. Stated in simplified terms, the plaintiffs' complaint alleged that Firstar's misrepresentations induced them into buying the cheese business, which turned out to be in bad financial shape, causing Grove Holding to go bankrupt. The bank counterclaimed for payment of Grove Holding's unpaid debts by the individual plaintiffs pursuant to their guaranties. For purposes of this Decision and Order the Court assumes the reader is familiar with the specific allegations and procedural history of this case.

This Court has issued numerous decisions and orders in the seven years since the case was filed. Most important among them are two that greatly narrowed and delineated the claims to be tried. First, in a Decision and Order dated June 1, 1995, the Court granted partial summary judgment to defendant Firstar on several theories and claims, paring plaintiffs' triable issues down to only negligent and intentional misrepresentation claims related to nine specific statements made by Firstar employees at a November 27, 1984, meeting. In the same document the Court also denied plaintiffs' motion for summary judgment on the bank's counterclaim concerning the guaranties. Second, in a Memorandum and Order dated August 19, 1996, addressing the plaintiffs' motion to reconsider the summary judgment order, the Court reaffirmed the June 1, 1995, decision and further discussed the dismissed as well as the remaining claims.

In regard to the nine specific statements from the November 27, 1984, meeting, which

the Court said could proceed as alleged misrepresentations, the plaintiffs voluntarily dropped three of the statements via an amended complaint. They abandoned another three during trial, then one more during the conference on jury instructions and form of verdict. As a result, the special verdict form gave the jury only the following two statements to consider: (a) Kasson's 1984 losses were non-recurring and not indicative of Kasson's true earning power; and (b) Kasson had adequate liquidity and working capital to carry on its business. As to each statement the jury was asked first whether the bank, in making it, committed intentional misrepresentation and then whether the bank's statement constituted negligent misrepresentation. The special verdict form then went on to address the plaintiffs' defense to the guaranties.

On September 30, 1997, at the end of a trial[1] lasting over two weeks, the jury found in favor of the plaintiffs in regard to all elements of the misrepresentation claims as well as plaintiffs' defense to the counterclaim. The current motions are defendant's attempts to overturn or nullify that verdict.

## I. RULE 50(B) MOTION

■ Federal Rule of Civil Procedure 50(b) allows the Court, notwithstanding the jury verdict, to order a new trial or enter judgment as a matter of law against a party when that party "has been fully heard [at trial] on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue," with respect to any claim that depends on that issue. Fed.R.Civ.P. 50(a), (b). Rule 50 allows the Court "discretion to grant judgment against a party that has failed to present legally sufficient evidence on a claim it has

fully argued." Byrne v. Board of Educ., 979 F.2d 560, 563–64 (7th Cir .1992). The standard is high, however—that no "reasonable jury [could] find for that party on that issue." Fed.R.Civ.P. 50(a). Therefore, when a verdict has been returned, this Court has to find that the jury was irrational before granting a rule 50 motion. See Tincher v. Wal–Mart Stores, Inc., 118 F.3d 1125, 1129 (7th Cir. 1997). In regard to a rule 50 motion, the Court must view the evidence in the light most favorable to the nonmoving party and ascertain whether any evidence exists upon which the jury could have based its verdict. Deimer v. Cincinnati Sub–Zero Products, Inc., 58 F.3d 341, 343–44 (7th Cir.1995).

### A. Misrepresentation Claims

■ In regard to the misrepresentation claims Firstar believes that rule 50(b) judgment as a matter of law is compelled because no reasonable jury could have found that Firstar made either an intentional or negligent misrepresentation and no reasonable jury could have concluded that plaintiffs relied upon Firstar's representations to their detriment. According to Firstar, the jury was misled by the "colorful metaphors" and "inflammatory rhetoric" of plaintiffs' counsel into believing that Firstar had done something wrong rather than determining liability based on the evidence before it.[2]

■ Claims of intentional and negligent misrepresentation have three overlapping elements: (1) the representation must be of fact and made by the defendant, (2) the representation of fact must be untrue, and (3) the plaintiff must believe such representation to be true and rely thereon to his damage. Whipp v. Iverson, 43 Wis.2d 166, 169, 168 N.W.2d 201 (1969); Wis. JI–Civil 2401, 2403.[3] Defendant argues that plaintiffs

---

1. The trial concerned the liability portion of the case. For discovery reasons the damages phase was bifurcated. The damages phase is yet to be scheduled for trial.

2. Any objection by Firstar to allegedly improper or prejudicial argument by plaintiffs' counsel was waived because Firstar never objected at trial nor moved for a mistrial. See Doe v. Johnson, 52 F.3d 1448, 1465 (7th Cir.1995).

3. Negligent misrepresentation claims add, obviously, (4) the element of negligence—that the

defendant failed to exercise ordinary care while under a duty of care or a voluntary assumption of a duty. Whipp, 43 Wis.2d at 170, 168 N.W.2d 201; Wis. JI–Civil 2403. Intentional misrepresentation claims add two different elements: (4) that the representation was made knowing it was untrue or recklessly without caring whether it was true or untrue, and (5) the representation was made with the intent to deceive and induce the plaintiffs to act upon it. Id. at 169–70, 168 N.W.2d 201; Wis. JI–Civil 2401. In addition, the plaintiffs' reliance has to be justifiable in

failed to present sufficient evidence on each of these elements, compelling judgment as a matter of law against plaintiffs on the mis-representation claims.

■■■ First, Firstar contends that the statements were opinions rather than representations of fact. The Court rejected this contention in its June 1, 1995, decision because whether statements are representations of fact versus expressions of opinion is usually a question of fact best left to the jury. Decision and Order (June 1, 1995) at 56. Moreover, even if the statements could be deemed opinions, statements of opinion that carry with them an implied assertion that the speaker knows facts exist which support the opinions are considered representations of fact. Wis. JI–Civil 2401, 2403. Back in 1995 the Court found that a reasonable jury could conclude that the statements at issue created a false picture of Kasson's financial health and were based on the bank's intimate familiarity with Kasson's operations and finances. The Court's position has not changed—and in fact is strengthened—based on the trial evidence, which indeed showed an intimate relationship between bank employee Russell Schuler and Kasson and sufficiently supported the jury's finding that the two statements at issue were representations of fact. The question was one for the jury, the jury was instructed as to what is and is not a representation of fact, and the jury made a reasonable decision based on the evidence.

■■■ Next, the bank argues that no reasonable jury could have found the two statements at issue untrue. According to the bank, plaintiff Hans Moede admitted on direct examination that the two statements were literally true. *See, e.g.,* Transcript at 828. Other evidence, says the bank, indicates that Kasson timely met all of its financial obligations (therefore it had adequate liquidity and working capital) and fails to show that Kasson's 1984 losses "were anything other than non-recurring."

■■■ The Court believes that the jury was not unreasonable in finding the repre-

regard to an intentional misrepresentation claim. *See* Wis. JI–Civil 2401; *Wentzka v. Gellman,* 991

sentations untrue. As the Court stated in its June 1, 1995, decision, "[a] representation can be technically accurate, yet still misleading." Decision and Order (June 1, 1995) at 38 (citing W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 106, at 736–37 (5th ed. 1984) ("[M]isrepresentation may be found in statements which are literally true, but create a false impression in the mind of the hearer.")). Though a person may not initially have an affirmative duty to speak, once that person speaks, he accepts the duty to disclose everything necessary to prevent his statements from being misleading. *See* Keeton, § 106, at 738 ("if the defendant does speak, he must disclose enough to prevent his words from being misleading" and "half of the truth may obviously amount to a lie, if it is understood to be the whole"); *see also Ollerman v. O'Rourke,* 94 Wis.2d 17, 30–31, 288 N.W.2d 95 (1980) (noting duty to disclose where a seller has told a half-truth or has made an ambiguous statement creating a false impression); *see* Restatement (Second) of Torts § 529 ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."); *cf. First Nat'l Bank & Trust Co. v. Notte,* 97 Wis.2d 207, 217, 293 N.W.2d 530 (1980) (discussing *Remington Sewing Machine Co. v. Kezertee,* 49 Wis. 409, 414, 5 N.W. 809 (1880), in which the court expressed that a "creditor, if he undertakes to give the information, is bound to disclose every material fact within his knowledge affecting the proposed liability"). The Court adheres to its statement made in connection with defendant's rule 50(a) motion during trial that "when you do speak, you have to speak fully and speak honestly." Transcript at 1790.

Therefore, Mr. Moede's admission about literal truth is not the end of matter. In regard to the statement about 1984 losses, the jury had before it sufficient evidence such that its findings of falsity were reasonable. Having heard the testimony at trial,

F.2d 423, 426 (7th Cir.1993).

the Court stated on September 24, 1997, that the evidence suggested that Kasson's use of sodium caseinate postponed its death. Transcript at 1789. Again, the Court's view of the matter has not changed. According to the evidence, the use of caseinate was not a one-shot affair that had been costly to Kasson, as the bankers represented. *See, e.g.,* Transcript at 831. Instead, caseinate use had gone on for two and a half few years, masking Kasson's money troubles by increasing yield and lowering materials costs. *See, e.g.,* Transcript at 1628–31. When the use of the powder stopped in 1984 Kasson lost substantial money. According to Mr. Moede, Firstar's representatives at the fateful November 1984 meeting did not tell him about any continuous use of sodium caseinate but instead told him that the reason for the 1984 losses "was the experimental use of this questionable additive, and that had ceased as well we were told." Transcript at 833–34. A reasonable jury could find that the 1984 losses were not a "nonrecurring" event due to experimental use of the powder and management problems—losses should have been showing up for years but had been hidden—and the bank was in a position to know that but said otherwise.

In regard to the liquidity and working capital statement, defendant contends that the record shows Kasson had adequate liquidity in 1984, 1985, and 1986, that "while thinly capitalized, [Kasson] had adequate capitalization during the same time frame," Brief in Support of Rule 50(b) Motion (Nov. 17, 1997) at 4, and that Kasson had positive earnings in seven out of ten years prior to the November 27, 1984, meeting. At the end of the plaintiff's evidence the Court stated: "I don't think there's any doubt that there has been a showing at least sufficient to get to the jury on the question of whether the window dressing loans had the [e]ffect of falsely magnifying the liquidity of Kasson." Again, the Court's view has not changed. Plaintiffs presented evidence that Kasson had far less money actually available to work with than the financial reports made it seem and the bank played a part in the money shifting that occurred. This was sufficient evidence for the jury reasonably to find that the bank was not speaking fully when its

representatives said Kasson had adequate liquidity and working capital to carry on its business. Whether Kasson's working capital was "thin" versus inadequate is a fine line. That defendant admits the capitalization was "thin" shows the jury had evidence before it to decide reasonably that the working capital was not as touted and the bank's statement was not the full truth.

The defendant's final attempt to overturn the verdict on the misrepresentation claims concerns the element of reliance. As stated above, plaintiffs had to rely on the misrepresentation to their detriment. Wis. JI–Civil 2401, 2403. Immediately following the November 1984 meeting, the plaintiffs invested in what became known as the "whey transaction" or "whey project"; the whey production plant they built used Kasson's byproducts from making cheese. The whey project was extremely successful. Transcript at 856, 1077–78, 1287. Plaintiffs and their partners had a complete return on their investment plus some profit in just a few years. After that successful venture the plaintiffs invested in a second project dependent on Kasson's and the whey plant's byproducts—the "lactose transaction". That project was no success. Transcript at 1113–15, 1205, 1290. Then the plaintiffs, their fortunes tied to Kasson's at that point, bought Kasson itself. Transcript at 873–75, 981–92, 1290. Not long afterward the plaintiffs learned that Kasson was not in good financial shape. Transcript at 921–925. Kasson then incurred substantial losses and later filed for bankruptcy. Transcript at 924, 1203–05.

The Court stated in the June 1, 1995, decision its belief that "a reasonable jury could conclude that the plaintiffs relied upon the bank representations to make their initial Kasson-related investment which led to additional Kasson-related investments and ultimately resulted in the plaintiffs suffering substantial pecuniary loss." This became known by the parties as the "continuum theory".

■ "Continuing misrepresentation" is a valid concept in tort law. According to the Restatement (Second) of Torts,

one who . . . induces another to deal with a third person knowing that the other is relying upon the maker's misrepresentation previously made to induce the other to act in a different and earlier transaction is subject to the same liability for pecuniary loss as though the maker had repeated the representation for the purpose of influencing the recipient's conduct in the later transaction.

Restatement (Second) of Torts § 535. The Restatement makes no mention of the need for the earlier transaction to have caused loss—the pecuniary loss to which section 535 refers is that of the later transaction only. Prosser and Keeton have noted a continuing duty even where a speaker initially thinks his statement is true: "one who has made a statement, and subsequently acquires new information which makes it untrue or misleading, must disclose such information to anyone whom he knows to be still acting on the basis of the original statement. . . ." Keeton, § 106, at 738.

 Defendant contends that the theory is a fallacy in this case because the success of the whey transaction disrupted any continuum. The initial transaction following the alleged misrepresentations was a success. Thus, according to Firstar, because the only allegedly false representations occurred prior to the whey transaction the plaintiffs suffered no damage—they cannot "be fooled into making money" or recover for their own fault in throwing bad money after good.

The Court believes that the profitability of the whey project does not break the continuum and cause the plaintiffs' misrepresentation claims to fail. Contrary to the bank's assertion that the later investments "had nothing to do with the alleged representations made years earlier," Reply Brief (Dec. 22, 1997) at 2, evidence at trial indicated that the November 1984 statements were indeed relied upon and incorporated by the plaintiffs in their assessment of whether they should enter the two later transactions. The individual plaintiffs testified that from 1985 through 1988 they continued to rely on the November 1984 representations by the bank employees, in particular in regard to their analysis of whether to enter the lactose project and the Kasson purchase. Transcript at 841–43, 915, 1205–06, 1289, 1293, 1352. At neither time did the bank correct its prior statements. See, e.g., Transcript at 892, 1206. The plaintiffs in fact told the jury that if they had not been misled by the bank they never would have entered into the initial whey transaction and certainly would not have thrown more money in for the lactose project and purchase of Kasson. See, e.g., Transcript at 1295. Firstar, of course, presented evidence that the plaintiffs could not or should not have relied on the bank's representations—for instance Mr. Emory's testimony that he advised the plaintiffs about what they were getting into, Transcript at 2035–68—but that just means this was a jury question. The Court believes the jury had before it sufficient evidence to find reasonably that the plaintiffs kept relying on both of the November 1984 representations by bank employees, which the bank failed to correct and instead reaffirmed, regardless of the success of the whey project.

 Firstar also argues that in regard to Kasson's use of the illegal additive sodium caseinate the plaintiffs knew of that use so they cannot have reasonably relied on the bank's failure to disclose the true nature of that use. The Court in its June 1, 1995, and August 19, 1996, orders did dismiss the plaintiffs' claims of misrepresentation in which they alleged that the bank's (and former defendant Grant Thorton's) failure to disclose the use of sodium caseinate *by itself* constituted a misrepresentation because Kasson's illegal use of caseinate had indeed been disclosed to the plaintiffs prior to the transactions. The issue presented to the jury at trial was a different one, however. The jury was *not* asked whether the simple failure to disclose caseinate use was a misrepresentation in and of itself. The jury instead was asked whether the bank's statement about non-recurring losses tied to "experimental" use of caseinate provided a false picture regarding the extent of caseinate use. The evidence showed that although the plaintiffs were aware of the "experimental" use of the illegal additive, they were not aware of any pervasive use. Therefore, their reliance

upon Firstar's statement regarding "experimental" use cannot be called unjustifiable.

## B. *Guaranty Counterclaims*

In regard to the guaranties, Firstar believes that rule 50(b) judgment as a matter of law is compelled because no reasonable jury could have concluded that at the time the plaintiffs signed the guaranties Firstar knew information that it reasonably believed was unknown to the plaintiffs and that materially affected the risk of the guaranties.

The guaranties executed by the plaintiffs each stated:

> The undersigned acknowledges and agrees that the Bank (a) has not made any representations or warranties with respect to, (b) does not assume any responsibility to the undersigned for, and (c) has no duty to provide information to the undersigned regarding, the collectability or enforceability of any of the Obligations or the financial condition of any Debtor or guarantor. The undersigned has independently determined the collectability and enforceability of the Obligations, and until the Obligations are paid in full will independently and without reliance on Bank continue to make such determinations.

Trial Exs. 1001–1004, 1006–1009. Defendant argues that this language negates all elements of the *Notte* defense and cannot be challenged by the plaintiffs' parol evidence to the contrary. In addition, says the bank, because the individual plaintiffs actually owned the debtor at the time they signed the guaranties, they were insiders deemed to possess the information *Notte* required to be disclosed. For these two reasons, Firstar contends, no reasonable jury could find that the *Notte* defense applied to discharge plaintiffs' liability.

The plaintiffs dismiss the bank's argument on the guaranties with too swift a hand, merely saying that because the jury found intentional misrepresentation the guaranties were void. The intentional misrepresentations, however, were found by the jury to have occurred in the continuum of transactions culminating with Kasson's purchase. The jury was not specifically asked whether the guaranties and loan documents, which were signed seven and twelve months after plaintiffs purchased Kasson, were induced by the same misrepresentations. The jury's special verdict answers had to be based on information known by the parties at the time the guaranties were signed and the jury was not restricted to considering only the two statements at issue in the misrepresentation claims. The difference is slight, but it requires looking at the Notte defense and defendant's arguments in the rule 50(b) motion rather than simply waving defendant's motion away with a magic wand.

■ Defendant contends that the above-quoted language ends the *Notte* defense without question because it cannot be challenged by plaintiffs' parol evidence at trial. A guaranty is a contract and the rules governing the construction of a contract apply to the construction of a guaranty. *Harris v. Metropolitan Mall,* 112 Wis.2d 487, 503, 334 N.W.2d 519 (1983). Extrinsic evidence of a prior or contemporaneous agreement generally is not admissible to contradict the terms of a contract unless the contract is ambiguous. *Caulfield v. Caulfield,* 183 Wis.2d 83, 92, 515 N.W.2d 278 (Ct.App.1994). However, a material misrepresentation of fact may render a contract void or voidable and the parol evidence rule does not exclude evidence to show such a misrepresentation as a ground for avoidance of the contract. *Bank of Sun Prairie v. Esser,* 155 Wis.2d 724, 731, 456 N.W.2d 585 (1990). In such a case the challenge really goes to the validity of the contract rather than the terms contained within it. *See id.*

■ Whether the guaranties were voidable because of an affirmative fraudulent misrepresentation or because of a material omission are separate questions recognized by *Notte. See Notte,* 97 Wis.2d at 208–09, 214, 293 N.W.2d 530; *Camp v. First Financial Fed. Sav. & Loan Assoc.,* 299 Ark. 455, 772 S.W.2d 602, 604 (1989) (elements set forth in Restatement (Second) § 124 (upon which *Notte's* omission defense relies) do not require surety to prove bad faith or fraudulent misrepresentation). The plaintiffs have sufficiently pursued only the latter issue, raising the former for the first time in a motion to

reconsider the Court's June 1, 1995, decision. As the Court stated in the August 19, 1996, order, that was too late. Memorandum and Order (Aug. 19, 1996) at 15–16.

That does not mean defendant is entitled to judgment notwithstanding the jury's verdict, however. While fraudulent inducement of the guaranties differs from the non-disclosure defense for purposes of the special verdict questions answered by the jury, the two theories are two sides of the same coin for purposes of parol evidence. The *Notte* court itself saw the two theories as two parts of a whole, framing the issue before it as "under what circumstances will a contractual surety obligation be rendered voidable based on the material misrepresentation or non-disclosure of a creditor," *Notte*, 97 Wis.2d at 208, 293 N.W.2d 530, and stating that

> The obligation of a creditor not to misrepresent material facts affecting the surety's risk, must be divided into two separate categories. The first involves situations where the non-disclosure of material facts known to the creditor may be sufficient to avoid a surety's contract. The second type of misrepresentation typically involves affirmative statements made by the creditor which reflect on the risk which are false when made or are false when the surety undertakes the obligation.

*Id.* at 214, 293 N.W.2d 530. According to the court, "[n]on-disclosure can form the basis for a misrepresentation sufficient to allow the avoidance of a contract obligation," *id.* at 219, 293 N.W.2d 530, and "[t]he fraud consists in the breach of a trust or confidence justly reposed, and, in most if not all cases, the silence of the party must import as much as a direct affirmation, and must be deemed equivalent to it," *id.* at 216, 293 N.W.2d 530. ▮ Therefore, the parol evidence rule does not require exclusion of evidence of a material omission as a ground for discharging liability under the contract for the same reasons that the rule does not exclude evidence of affirmative misrepresentations. Like a fraudulent inducement defense, the plaintiffs defended against the bank's claims by disaffirming the agreement completely, not by affirming the agreement and trying to alter any of its express terms; therefore the

parol evidence was properly admitted. While the terms of the contracts themselves were evidence in the bank's favor, the plaintiffs presented contrary parol evidence, and the jury made its choice.

The plaintiffs purchased Kasson in October 1987. They signed the guaranties at issue in this case in May 1988 and October 1988. Firstar next argues that because the individual plaintiffs were "insiders" for several months before signing the guaranties, as a matter of law they are deemed to have possessed the information on Kasson's financial status that they now claim the bank's representatives failed to disclose. In support of this argument Firstar presents an Arizona Court of Appeals case, *First Nat'l Bank of Ariz. v. Bennett Venture, Ltd.*, 130 Ariz. 562, 637 P.2d 1065 (Ct.App.1981), which held that a guarantor who was the majority stockholder and major creditor of the corporate debtor and was in business with the other guarantor "was in a better position to know [about the other guarantor] and his financial condition than the Bank." *Id.* at 1067. Firstar also points to the Restatement, which suggests that when there is a control relationship between the principal obligor and the secondary obligor "the likelihood of the secondary obligor having independent access to information about the principal obligor is so high that little purpose would be served by litigating the issue," it being preferable to place the cost of inadequate communication on the parties to the control relationship rather than forcing the obligee to police the flow of information between them. Restatement (Third) of Suretyship and Guaranty § 12 cmt. h (1996). According to Firstar, "the law imputes that knowledge to the Plaintiffs and as a result, no reasonable jury could have found the Notte elements present in this case." Brief in Support of Rule 50(b) Motion (Nov. 17, 1997) at 10.

While the facts of *Bennett Venture* are similar to those involving the *Notte* defense in this case, and the Restatement does have persuasive value, Wisconsin law itself indicates that judgment as a matter of law for defendant is not warranted on this point.

In Wisconsin, the law imputes to a corporation the knowledge of one of its officers relating to any matter of which he or she has the management or control. *Suburban Motors of Grafton, Inc. v. Forester*, 134 Wis.2d 183, 396 N.W.2d 351 (Ct.App.1986) (citing 3 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 790 (rev.perm. ed.1975)). The reverse is not necessarily true, however, as it involves a type of "piercing the veil" of the corporate entity. *See Fish v. White Equipment Sales & Serv., Inc.*, 64 Wis.2d 737, 742–43, 221 N.W.2d 864 (1974) (attributing action of corporation's sole director to cease business to him as a salaried employee for purposes of determining whether his employment was terminated voluntarily requires piercing the corporate veil and finding that the corporation was merely the person's alter ego).

In *Kohl v. F.J.A. Christiansen Roofing Co.*, 95 Wis.2d 27, 289 N.W.2d 329 (Ct.App. 1980), plaintiff Kohl and two other men, Taubman and Kughn, were partners in the Southridge Company. Taubman and Kughn were also officers, directors and shareholders of the general contractor hired by the Southridge Company to build a shopping mall. While the mall was under construction the roof of the mall experienced wind uplift damage but was immediately repaired. The roof was inspected and a report was delivered to the general contractor stating that there were deficiencies still remaining in the roof, but no further repairs were made. Years later, the mall experienced roof problems tied to the faulty repair work and had to be replaced. Kohl sued various defendants on behalf of the partnership to recover damages. The defendants raised a statute of limitations defense based on the date of the report. Kohl, however, argued that he and Southridge did not know about the report and learned only of the repair problems when the roof had to be replaced. The trial court dismissed Kohl's claim, finding that the report, and thus knowledge of the faulty repairs, was delivered to the general contractor, that knowledge was imputed to Taubman and Kughn as officers of the general contractor, and then that knowledge was imputed to Southridge and Kohl because partner Taub-

man was their agent. *Id.* at 30–31, 289 N.W.2d 329.

While noting that some jurisdictions have conclusively presumed the director or officer of a corporation to have knowledge of the affairs of that corporation, the Wisconsin Court of Appeals refused to follow that line of cases., instead following other

> strong support for the proposition that a director or officer is not responsible for knowledge of all the affairs of a corporation, and that it is proper to impute knowledge only when the facts are sufficient to justify the finding that a director had or should have had knowledge.

*Id.* at 36, 289 N.W.2d 329. According to the court,

> The better rule seems to be that knowledge acquired by the corporation should not be imputed to another officer or director as an individual unless there is first an examination of the duties of the directors or officers and the diligence displayed in performing their duties.... We, therefore, conclude that whatever knowledge a director or officer has or ought to have will not necessarily be imputed to him as a private individual until after an examination of the duties of the directors or officers and after the fact finder has had an opportunity to determine whether diligence in performing those duties would have provided disclosure. Our holding is in line with [prior Wisconsin Supreme Court cases] which hold that whether an individual can be charged with constructive knowledge is generally a question of fact and that individuals cannot close their eyes to obvious facts.

*Id.* at 36–37, 289 N.W.2d 329.

Knowledge contained in Kasson's files thus cannot be imputed to the individual plaintiffs as a matter of Wisconsin law. Even though they became officers, directors, and shareholders in Kasson/Grove, whether the individual plaintiffs themselves had knowledge of the facts materially increasing their risk, which they claim the bank withheld, was a question of fact for the jury. The jury was free to believe the plaintiffs' testimony that they did know such facts at the time they signed the guaranties nor did they

learn such facts until Kasson was on the verge of bankruptcy. *See, e.g.,* Transcript at 924–28, 930–32.

Importantly, in its rule 50(b) motion Firstar does not contend that if the above two arguments fail regarding the *Notte* defense the evidence was insufficient to support the jury's verdict. Therefore, no basis for overturning the jury's verdict on the guaranties exists. The rule 50(b) motion therefore will be denied.

## II. *RULE 59 MOTION*

■ Federal Rule of Civil Procedure 59 allows the Court to grant a new trial on all or part of the issues in a case. Fed.R.Civ.P. 59(a). A motion for a new trial under rule 59 is addressed to the sound discretion of the district court. *Cole v. Bertsch Vending Co.,* 766 F.2d 327, 332 (7th Cir.1985). According to 11 Charles A. Wright, et al., *Federal Practice and Procedure: Civil 2d* § 2805 (footnotes omitted),

> the general grounds for a new trial are that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair, and ... the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence or the giving or refusal of instructions.... The court has the power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice.

A rule 59 motion must be considered in conjunction with rule 61, however, which states: "No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order ... is ground for granting a new trial ... unless refusal to take such action appears to the court inconsistent with substantial justice."

Firstar contends that a new trial must be granted for any of three reasons: prejudicial error by the Court, inconsistencies in the verdict, and verdict answers contrary to the weight of evidence. The bank asserts that each of these grounds alone, and certainly the impact of all three together, is sufficient to warrant a new trial.

### A. *Alleged Judicial Error*

First, the bank insists that a new trial is warranted because of judicial error. According to the bank, the Court (1) improperly allowed the presentation of evidence related to the "window-dressed loans" and Kasson's use of sodium caseinate and surprised the bank by doing so, and (2) failed to submit separate special verdict questions related to the plaintiffs' reliance at the time of each individual transaction (i.e. the whey transaction, the lactose transaction, and the Kasson purchase).

### 1. *Evidentiary Admissions*

Admission of plaintiffs' evidence regarding the window-dressed loans and sodium caseinate was the subject of several motions *in limine* decided by the Court on the first day of trial. Firstar attempted to exclude all evidence that Kasson had used the illegal additive in its cheese operations and all evidence of the various year-end loans made by the bank to Kasson in order to allow Kasson to manipulate its balance sheet and fool a state regulatory agency regarding its current ratio.

Firstar's motions *in limine* were based upon its reading of the Court's June 1, 1995, and August 19, 1996, decisions. In those decisions, the Court held that the bank's simple act of lending money to Kasson did not in and of itself constitute a misrepresentation. In addition, the Court indicated that in regard to any claim that the bank failed to disclose Kasson's use of sodium caseinate the undisputed evidence showed that the plaintiffs did in fact know Kasson had used the illegal additive and therefore could not have relied upon a failure to disclose the use to their detriment. Firstar read these decisions to mean that all evidence of the window-dressed loans and sodium caseinate use was completely out of the case.

The Court's decisions left to be tried nine alleged statements made by the bank's representatives at the November 27, 1984 meeting. As stated above, those statements were whittled down to two: (a) Kasson's 1984 losses were non-recurring and not indicative of Kasson's true earning power; and (b) Kasson

had adequate liquidity and working capital to carry on its business. While the Court's decisions eliminated from the case claims based upon the window-dressed loans and sodium caseinate use themselves, the Court does not believe that its June 1, 1995, and August 19, 1996, decisions in any way determined that the window-dressed loans and sodium caseinate usage were completely irrelevant to determine the truth or falsity of the above statements.

■ As the Court stated in its June 1, 1995, decision, "[w]e cannot say that no reasonable jury could conclude that the plaintiffs did in fact rely on the representations in the financial[s] to overestimate the viability and value of the company." Decision and Order (June 1, 1995) at 31. The window-dressed loans and financial statement manipulations were intertwined with Kasson's liquidity, causing Kasson's financial statements to overestimate the current ration and liquidity, and thus the viability and value, of the company. The bank's representatives, knowing about the window-dressed loans, nevertheless told the plaintiffs that Kasson had adequate liquidity and working capital to carry on its business, creating a false picture of the financial health of Kasson. Because the window-dressed loans were relevant to determining whether Kasson did in fact have adequate liquidity and working capital, the Court believes that evidence was properly admitted.

The sodium caseinate issue likewise was relevant to the question whether Kasson's liquidity and working capital were adequately reflected by its financial statements. The Court's June 1, 1995, decision indicated that the plaintiffs would be allowed to continue on the theory that "they did not know the full extent of Kasson's troubles and that the alleged misrepresentations were a substantial factor in their decision to invest in Kasson." Decision and Order (June 1, 1995) at 31. Expert Herbert Heavenrich's testimony at trial bore out the relevance of the caseinate use to the "full story" of Kasson's financial state. Mr. Heavenrich indicated that Kasson's use of the powder

> falsely represented the actual gross margin and therefore, net income in the years 1981, '82, '83, and part of '84 to a very

significant amount, by my estimation some $3 million dollars. Others may have other—that's a very, very large amount of money."

Transcript at 1631.

■ The use of sodium caseinate also, and even more so, was relevant to the question whether Kasson's 1984 losses were nonrecurring and due to an experimental use of caseinate powder. This Court indeed held previously that the evidence showed that plaintiffs knew about Kasson's caseinate usage. But this Court did not hold that plaintiffs knew such usage was pervasive over the course of years. Mr. Moede testified at trial that they knew only of purported short-term use. Transcript at 831. By saying that the caseinate use was experimental the bankers were in effect saying that no profits from prior years were based on casein use at all. The extent of the caseinate use was certainly relevant to the question whether such use was "experimental" versus routine; and thus whether Kasson's low profits for 1984, when such use and the resultants padding of profits stopped, would continue or instead were a mere aberration. The fact that plaintiffs clearly knew of *some* use of caseinate (such that they cannot hold the bank liable on an independent claim for failure to disclose Kasson's illegal action) does not eliminate from the case evidence that the bank misled them about the extent of caseinate use.

The Court admits that one paragraph in its August 19, 1996, decision may have misled the bank to some extent. In the motion for reconsideration the plaintiffs had argued that Firstar was under a duty to disclose material facts about Kasson because bank representatives made the misleading statements at the November 27, 1984, meeting. The plaintiffs argued that once the bank made the alleged misrepresentations at that meeting, it was under a duty to disclose everything it knew about Kasson to correct the misrepresentations. In response, the Court stated that

> [t]his new theory of misrepresentation liability was not presented in the plaintiffs' initial brief in opposition to the defendants' summary judgment motion. The plaintiffs, therefore, have waived this argument.... Moreover, this new argument is not even

supported by citation to Wisconsin authority. While it is true that a party to a transaction is obliged not to make representations that are only partly true (and thus misleading), such misrepresentations do not create a general duty to disclose all information in subsequent dealings between the parties. If Firstar did indeed make misrepresentations of fact at the November 27, 1984 meeting and the plaintiffs establish all other elements of the misrepresentation torts asserted, the bank will be liable for the damages resulting therefrom. Had the bank corrected the allegedly misleading representations earlier in the relationship, its exposure would be limited. However, the plaintiffs cannot bootstrap a potentially misleading representation into a blanket duty to disclose.

Memorandum and Order (Aug. 19, 1996) at 7–8 (citation omitted).

■■■ The statement by the Court regarding waiver of this argument was incorrect. As the plaintiffs pointed out in their briefs regarding the motions ·in limine, Brief in Opposition (Sept. 8, 1997) at 13 n. 2, they did raise that argument in response to the summary judgment motions, see Plaintiffs' Objection (Feb. 10, 1995) at 9–10. The Court revisits and corrects the above statement regarding waiver only because it appears to have been a clear mistake. The fact that the Court incorrectly deemed plaintiffs to have waived this argument does not mandate a new trial, however. Firstar had the ability to check whether the plaintiffs had indeed waived the argument and should have contemplated that the Court could correct that type of error.

The Court also stated, however, that even if not waived this argument was not supported by Wisconsin authority. Firstar has attached great importance to that statement, using it to argue that the Court thereby precluded the bank from being responsible for divulging the window-dressed loans and caseinate use to plaintiffs, as a result rendering all evidence of such matters irrelevant and improper for admission at trial. The above-quoted language concerned the plaintiffs' contention that the bank had a blanket duty to disclose information on Kasson's fi-

nancial status—a blanket duty that included knowledge about the window-dressed loans and caseinate use. The Court believes that even though it rejected such a blanket duty, the above language nevertheless kept alive, as a viable matter, the possibility that the loan and caseinate evidence could establish whether the November 27, 1984, statements themselves were misrepresentations: "If Firstar did indeed make misrepresentations of fact at the November 27, 1984 meeting and the plaintiffs establish all other elements of the misrepresentation torts asserted, the bank will be liable for the damages resulting therefrom." Memorandum and Order (Aug. 19, 1996) at 8.

■■■ As the Court stated when makings its rulings on the motions in limine, its prior decisions were not as "brick solid" as a bar to evidence of the window-dressed loans and caseinate issues as Firstar may have believed. The fact that the bank read those decisions more expansively than they were meant does not translate into a justification for a new trial. Moreover, as shown by the affidavit of plaintiffs' counsel, submitted with the brief opposing this rule 59 motion, even after the Court issued its June 1, 1995, opinion the bank nevertheless questioned each of plaintiffs' experts and plaintiff Moede about the window-dressed loans and sodium caseinate usage. See Affidavit of Lee Anne N. Conta (Dec. 5, 1997) at 1–3. As evidenced by its motions in limine, the bank knew the plaintiffs wanted to rely on the loan and caseinate evidence at trial. The bank, which now asserts that if it had known such evidence would be admitted it would have had an additional expert, cannot now claim such surprise as would merit a new trial.

### 2. *Special Verdict Questions on Reliance*

Throughout the course of this case the plaintiffs have argued that the November 27, 1984, statements by the bank's representatives caused them to enter into three transactions—the whey transaction, the lactose project, and the purchase of Kasson itself. They have argued that but for the bank's misrepresentations the plaintiffs would have walked away from the whole involvement with Kas-

son. As noted above, the Court's June 1, 1995, Decision and Order instigated the characterization of this reliance as the "continuum theory"—they relied upon the bank representations to make their initial investment, which led to additional investments and ultimately resulted in pecuniary loss.

The form of special verdict was discussed as part of a day-long instructions conference, held on September 29, 1997, involving counsel for both parties and the Court. At that time, Firstar's attorneys requested that within each of the four questions regarding misrepresentation the special verdict separate the question regarding plaintiffs' reliance into three subparts, one for each of the whey transaction, the lactose transaction, and the Kasson purchase. The Court declined to break out the reliance issue in that manner because it thought such additional questions, because of their content and the fact that they would add eight additional questions for consideration, would unnecessarily confuse the jury.

 Under Federal Rule of Civil Procedure 49(a), a district court has considerable discretion regarding the nature and scope of the questions submitted to the jury as special verdict questions. *Hibma v. Odegaard,* 769 F.2d 1147, 1157 (7th Cir.1985). Special verdict questions should pose the question presented by the case accurately and be stated in a fashion that avoids the potential for confusing or misleading the jury. *Id.* The Court has not changed its mind. The Court believes that the special verdict questions presented to the jury accurately reflected the plaintiff's continuum theory and that the additional questions requested by Firstar would have led to a confusing, and confusingly long, special verdict form for the jury to consider.

### B. *Inconsistencies in the Verdict*

Next, Firstar contends that a new trial must be granted because by their special verdict the jury found, inconsistently, that the bank representatives made the two representations both intentionally and negligently. Firstar asserts that the special verdict form should have instructed the jury that it could answer only one question—either intentional or negligent misrepresentation—in

regard to each alleged statement. Such an instruction could have been effected by the inclusion of a default prefix before the negligent misrepresentation questions (for example: "If you answered question 1 yes, do not answer question 3.").

 Failure to object to the form or wording of a special verdict prior to its submission to the jury constitutes a waiver of the right to object later. *See Sims v. Mulcahy,* 902 F.2d 524, 533–36 (7th Cir.1990); *Matter of Innovative Const. Systems, Inc.,* 793 F.2d 875, 882 (7th Cir.1986). If the party presently complaining participated in drafting the form that was ultimately submitted to the jury and requested the portion of the verdict of which it now complains, waiver likely will be found. *See id.*

Firstar contends that these rules of waiver do not apply to the present situation of an inconsistent verdict. The Court disagrees. In *Sims* the Seventh Circuit addressed a situation where the jury found that plaintiff had been deprived of fourth amendment rights, but failed to award her even nominal damages. Sims's attorney had ample opportunity yet failed to object to the lack of an instruction or statement in the special verdict question telling the jury that it had to award at least $1 if it found the deprivation. Sims argued unsuccessfully that the question of whether the law required that she receive nominal damages was a legal question that could not be waived. The Seventh Circuit rejected that argument and treated objections to the form and content of a special verdict the same as objections to instructions, in essence applying Federal Rule of Civil Procedure 51 ("No party may assign as error the giving ... [of] an instruction unless that party objects thereto before the jury retires") to find a waiver. *See Sims,* 902 F.2d at 533–36.

 At no time prior to the special verdict being submitted to the jury did Firstar make any objection on this basis. *See* Transcript at 2336–42, 2345–46; *see also* Michael Best & Friedrich LLP Letter to the Court (filed Sept. 30, 1997) ("MBF Letter") (suggesting changes to the draft verdict form). Firstar's own proposed special verdict forms

in fact had the same "problem" it now asserts the special verdict had. *See* MBF Letter, attachment at question 2 (inserting "Go to Question 3" after question 2); Defendant's Special Verdict Form (Sept. 25, 1997) (no corrective default prefix before questions 8 and 17). The special verdict form was discussed for hours at the September 29, 1997, conference in chambers and this objection was not raised. The Court has some recollection of the topic coming up, with the parties actually agreeing that they wanted the jury to answer both intentional misrepresentation and negligent misrepresentation questions in the event one claim or the other failed post-trial or on appeal. Whether this recollection is correct or not, the Court finds that Firstar nevertheless waived this point by failing to raise it before submission of the verdict form to the jury.

### C. *Verdict Answers Contrary to the Weight of Evidence*

Finally, Firstar argues that the verdict answers were contrary to the weight of evidence. On a motion of this kind, as opposed to a motion for judgment as a matter of law,

> the judge may set aside the verdict even though there is substantial evidence to support it. The judge is not required to take that view of the evidence most favorable to the verdict-winner. The mere fact that the evidence is in conflict is not enough to set aside the verdict. Indeed the more sharply the evidence conflicts, the more reluctant the judge should be to substitute his judgment for that of the jury.

11 Charles A. Wright, et al., *Federal Practice and Procedure: Civil 2d* § 2806 (footnotes omitted).

Firstar spends only a few paragraphs on this argument, perhaps recognizing that the evidence in this case conflicted sharply and that the Court would be reluctant to substitute its judgment for that of the jury. The Court similarly will address this argument in just a few words.

■ At trial the parties presented greatly conflicting evidence and highly contrasting theories of the case. There was little the

parties actually agreed upon. Each party's characterizations of the other's case and evidence was extremely critical. In short, this was a hotly contested and vigorously litigated trial. The Court sees no injustice in the jury's resolution of the issues based on the evidence presented and is not going to disturb the jury's verdict.

In sum, Firstar's rule 59 motion also will be denied.

### III. *OTHER MATTERS*

There are just a couple of other things for this judge to address.

Last autumn the plaintiffs filed a Local Rule 6.07 motion to compel discovery. Firstar responded by saying it had reviewed the material submitted by the plaintiffs in support of their motion and agreed that it should turn over the discovery information. Although the matter thus was resolved by the parties without Court intervention, the docket report in this case does not so indicate. A short order at the end of this decision, denying the motion because it now is moot, will tie up that loose end … which leads the Court to the final matter.

This case is one of the very last remaining on this senior district judge's civil docket, as he has been transitioning into retirement over the last couple of months. The parties have been urging the Court to schedule trial of the damages phase for May 1998, but this judge has delayed setting the date while contemplating whether he or another district judge should conduct the second trial. The Court has determined that the case should be transferred at this point.

### IV. *CONCLUSION*

**THEREFORE, IT IS ORDERED** that defendant's November 17, 1997, motion for judgment as a matter of law pursuant to rule 50(b) is **DENIED.**

**FURTHER, IT IS ORDERED** that defendant's November 17, 1997, motion for a new trial pursuant to rule 59 is **DENIED.**

**FURTHER, IT IS ORDERED** that plaintiffs' November 12, 1997, motion to compel discovery is **DENIED AS MOOT.**

**AND FINALLY, IT IS ORDERED** that this case be **RETURNED TO THE CLERK OF COURT** for reassignment to another district judge.