Thomas R. **FRAZIER**, Plaintiff,

v.

Gerald P. **BOYLE**, Defendant.

No. 00–C–0985.

United States District Court, E.D. Wisconsin.

March 19, 2002.

Christopher T. Hale, Hale & Wagner, John C. Cabaniss, Cabaniss Law Office, Milwaukee, WI, for plaintiff.

Kathryn A. Keppel, Thomas E. Brown, Gimbel Reilly, Guerin & Brown, Milwaukee, WI, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

In this diversity case plaintiff, Thomas R. Frazier, a citizen of Roseville, Minnesota, sued defendant Gerald P. Boyle, a Milwaukee lawyer, for negligence and breach of fiduciary duty arising out of Boyle's representation of Frazier in a lawsuit against his former employer. After a trial the jury found for Frazier on the breach of fiduciary duty claim and awarded him $89,000.[1] Boyle now brings several motions for post-judgment relief.

### I. FACTS

I recount the facts in the light most favorable to Frazier for two reasons. First, to the extent that I am considering Boyle's motion under Fed.R.Civ.P. 50 for judgment as a matter of law, I am obliged to view the facts in the light most favorable to the non-moving party. *Molnar v. Booth*, 229 F.3d 593, 597 (7th Cir.2000). Second, to the extent that I am reviewing the jury's verdict, I must view the facts in the light that supports

its verdict. *McCalpine v. Foertsch*, 870 F.2d 409, 414 (7th Cir.1989).

In 1996, Frazier was fired by Bachman's Inc., a Minneapolis business, for which he had worked for twenty-seven years. Believing that he had been wrongfully terminated, he retained a Minneapolis law firm, Sandra Boehm & Associates, and commenced a suit against Bachman's in state court in Minnesota. He entered into a written fee agreement providing that the Boehm firm would be paid on an hourly rate, and a lawyer in the firm, Carole Ryden, was assigned to the case.

While his case was pending, Frazier had occasion to watch a trial on Court TV, involving a suit by Jerold Mackenzie against his former employer, the Miller Brewing Company. Boyle was Mackenzie's lawyer, and Frazier was impressed by his performance in the courtroom.

Through Ryden, Frazier contacted Boyle about the possibility of becoming involved in his case. Boyle had planned to attend a football game in Minneapolis on December 1, 1997, and arranged to meet with Frazier and Ryden to discuss the case. Frazier testified that after he told Boyle about the case, Boyle told him that he had gotten a raw deal, and that he, Boyle, would make things right. Frazier also testified that Boyle asked him how much money he had available, and he said that in the entire world he had about $200,000. The meeting was brief, and the question of whether Boyle would participate in Frazier's case was not resolved.

Frazier testified that on December 11, 1997, Boyle called him and said, "Tom, ... here's what we're going to do.... [W]e're going to take a hundred thousand dollars from you for expenses and costs, and we're going to take a 40 percent contingency...." (Tr. at 248.) Frazier was heartened that Boyle had agreed to accept his case, but thought that a forty percent contingency fee was high. As a result, he drafted a letter, dated December 12, 1997, and handed it to Boyle at a meeting in Milwaukee on December 13, 1997. The meeting was attended by

1. Plaintiff agreed to the dismissal of the negligence claim before the case was submitted to the jury.

Frazier, Boyle, Ryden, and Michael Whitcomb, a Milwaukee lawyer who had assisted Boyle on the Mackenzie case.

In the letter, Frazier said that he would provide "the $100,000 up-front money between now and mid-January 1998" (Pl.'s Ex. 3 at 1), and "any additional money you may require before my case reaches fruition" (*id.*). He asked Boyle if he would accept "30% of any compensatory damages awarded, based on your staff's computation of these damages, and, also, 30% of any punitive damages," and "on any amount awarded by the jury over and above our base compensatory damages and court awarded punitive damages. On the discrimination counts I would happily pay the 40% we discussed during our December 11th phone conversation." (*Id.*)

Frazier testified that at the December 13 meeting Boyle agreed to become lead counsel in his case but declined to reduce the contingency fee, saying that it "would have to be the 40 percent as he had stated on the phone on the night of December 11th." (Tr. at 253–54.) At Boyle's direction Frazier wrote a letter to the Boehm firm explaining that Boyle had become lead counsel, and that Ryden would continue to provide legal services as directed by Boyle. Boyle and Frazier agreed that Ryden would continue to be paid hourly for her work, and Boyle also advised Frazier to "cut Ms. Ryden in for five or ten percent as well, because of the work that Mr. Boyle saw that Ms. Ryden had done." (*Id.* at 257.) Boyle asked Frazier for a check for $100,000. Frazier, however, could only write a check for $10,000 but said that he could pay the balance within a month. Boyle explained that Whitcomb would be working on the case with him and directed Frazier to write the $10,000 check to Whitcomb, which Frazier did.

On January 7, 1998, Frazier sent a check to Boyle for the additional $90,000. Frazier testified that it was his understanding that he hired Boyle on a forty percent contingency fee, and that the $100,000 was an advance to cover the costs of the litigation. Boyle disputed that he took the case on a contingency fee basis and testified that "I do not do contingency fee cases." (*Id.* at 410.) Boyle

said that he took the case for "a minimum of one hundred thousand dollars" (*id.* at 52), which could rise to $200,000 but that out of the fee he would pay all costs of the litigation including "[e]very single solitary thing" (*id.* at 53).

Concerning Frazier's December 12, 1997 letter, Boyle was asked at trial whether he felt a responsibility "to put in writing the fact this was not in your view a contingent fee agreement, since he [Frazier] clearly indicates his understanding that he thought he was going to have to pay you 40 percent?" (*Id.* at 100.) Boyle responded that Frazier could not have had such an understanding because "[i]t was absolutely crystal clear ... that this was not going to be a contingency fee agreement. ... I would not have done it. For anyone." (*Id.* at 101.) Frazier's lawyer again asked Boyle whether he felt an obligation to put the fee agreement in writing, and Boyle responded that he did not, adding that "sometimes I think lawyers put too much in writing." (*Id.*)

Frazier's lawyer then asked Boyle about the fee arrangements in the Mackenzie case. Boyle testified that Mackenzie initially paid him $75,000, but that he and Mackenzie had an unwritten understanding that he would also receive a contingency fee. In Mackenzie's case, after several weeks of trial, and one day before the jury awarded Mackenzie some $25 million dollars, Boyle directed Mackenzie to put their understanding in writing, whereupon Mackenzie wrote Boyle a note stating "this is to confirm that we had previously agreed to a sixty-forty split of any award pursuant to *Mackenzie v. Miller, et al.*, and I do continue to confirm this as the agreed upon arrangement." (Ex. 26–003.) About a month after the verdict for Mackenzie, Boyle and Whitcomb asked Mackenzie to sign a written contingency fee agreement increasing the contingency fee to fifty percent, and Mackenzie did so. Boyle testified at trial in the present case that his statement that he did not take cases on a contingency fee basis did not mean that he did not sometimes turn a fee arrangement that had started out as a flat fee deal "into a contingency fee" later on in a case. (Tr. at 50–51.)

Frazier continued to be concerned about his fee arrangement with Boyle and pressed Boyle to put the agreement in writing. On February 8, 1999, Frazier sent a letter to Boyle stating that:

A third issue is that we have not formalized a contingency agreement and therefore have not documented the terms of our financial agreement relevant to my case. As you know, I have paid you $100,000 to cover up[-]front expenses and I have accepted your 40% contingency fee on any jury award which I receive.... With the amount of money that could be at stake I would feel better with something in writing.

(Ex. 18 at 2.)

Boyle did not respond to Frazier's letter for approximately two months. On April 6, 1999, Boyle replied that later on he and Frazier would have to "sit down and finalize the financial terms." (Ex. 19.) Boyle testified that his handling of Frazier's February 8 letter "was a terrible mistake." (Tr. at 446.)

On June 25, 1999, after Frazier had lost his case on summary judgment and exhausted all appeals, he requested that Boyle "prepare a statement of your fees and costs in my case. I would like anything remaining of the $100,000 I advanced to you returned as soon as possible. I am financially ruined and am sorely in need of the money remaining in my trust account." (Ex. 21.)

On July 8, 1999, Boyle replied as follows: I remember meeting you in St. Paul at the Grill and telling you that the matter could be as high as $200,000 and that we would need $100,000 to come into the case. This was not a matter of money being held and doled out as it was earned. This was a matter of my doing everything for you that I could possibly do and paying everyone that came along to make sure that we did the best possible job for you.... I cannot believe you seriously believe that there is money to be returned.... But I will write you again after I reconsider this entire matter.... If I am successful [in the *Miller* case which is being argued on August 18, 1999] I will have a lot of money and then may be I might be in a position of philanthropy, which might include sending money to good people who have been wronged and have no recourse to correct injustices.... I would like to send you some money and with the grace of God maybe that will happen in the not so distant future.

(Ex. 22 at 1–2.)

Frazier testified that when he received Boyle's letter he was insulted because "[i]t almost made me feel like a bum standing on the street corner asking for a handout." (Tr. at 314.)

The trial record contained evidence with respect to the legal services Boyle and Whitcomb provided to Frazier in return for the $100,000 payment. Neither Boyle nor Whitcomb attended any part of Frazier's deposition, which consumed forty-four hours. Nine other depositions took place, of which Boyle attended one as an observer and Whitcomb conducted two. Neither Boyle nor Whitcomb was involved in preparing Frazier's brief in opposition to the summary judgment motion or his briefs in the Minnesota Court of Appeals or the Minnesota Supreme Court. Neither Boyle nor Whitcomb maintained any records concerning the time that they put in on Frazier's case. With respect to the court of appeals brief, Frazier testified that Boyle said "Tom, you have been around this stuff enough and you have probably got the background, why don't you write an appellate brief." (*Id.* at 306.)

The record also indicates that after giving Boyle $100,000 Frazier continued to incur legal expenses. Between December 13, 1997, and June 1998, Frazier paid the Boehm firm and Ryden (who left the Boehm firm in January 1998) a total of $42,541.20 in fees and $9,412.92 in costs and also paid the fees of two expert witnesses. None of these expenses were paid for by Boyle.

Out of the $100,000 that he received from Frazier, Boyle paid $48,500 to Whitcomb and $7,500 to Mackenzie, whom Boyle hired as a "consultant" in Frazier's case. (Ex. 26.) Whitcomb characterized the payment to Mackenzie as "an appropriate act of charity ... because [Mackenzie] was desperate for money and had nothing to do." (Tr. at 206.) On March 30, 1998, the Minnesota trial judge

stated that she would very likely grant the defendant's motion for summary judgment in Frazier's case. Nevertheless, in April 1998 Boyle spent about $3,000 to conduct a mock trial to determine how a jury might react to Frazier's case. Boyle kept $20,000 for himself and spent about $9,000 on transportation. Finally, he paid about $12,000 to the Cox law firm, which was a second Minneapolis firm brought in to write Frazier's appellate brief.

Frazier presented evidence that at the time Boyle became involved in his case, Boyle was facing serious financial problems. Boyle and Whitcomb had put a substantial amount of time into the Mackenzie case but had received no part of the $25 million verdict because Miller had appealed.[2] Boyle acknowledged that in December 1997 he and Mackenzie borrowed $400,000 from a venture capital firm; about $125,000 of that money was to help Mackenzie get "through the next couple of years" (*id.* at 60), and the balance was to ease Boyle's financial difficulties. As collateral for this loan, Boyle had to put up his life insurance, his wife's inheritance and some of the potential verdict or settlement money in the Mackenzie case. Boyle testified that he was "always in need of money" (*id.* at 56), that he "was in the process of finding a way of reducing some financial pressures" (*id.*), and that he "always [had] financial difficulties" (*id.* at 57).

Curry First, a plaintiff's employment lawyer of some thirty years, testified at trial as an expert for Frazier. First testified that as part of his fiduciary duty to a client, a lawyer representing a plaintiff in an employment case had to fully explain the fee arrangement and, to ensure that the client understood and agreed to it, reduce the agreement to writing. He also testified that Boyle had failed to meet these requirements and thus had breached his fiduciary duty to Frazier. First based his conclusion with respect to the standard of care on a number of factors. These factors included the complexities relating to fees in employment cases and the documents in the Frazier case in which Frazier communicated to Boyle an understanding of their fee arrangement different from Boyle's and

asked Boyle to put the agreement in writing. First did not (even in part) base his opinion regarding the applicable standard of care or his conclusion that Boyle breached his fiduciary duty on the rules promulgated by the Wisconsin Supreme Court governing the conduct of lawyers.

First testified that one of the complexities relating to fees in employment cases was the availability of fee shifting. He said that the possibility that a winning plaintiff could obtain fees from a defendant required special attention, so that lawyer and client had a clear understanding of the amount of fees that might be recovered and how they would be divided. He also testified that the United States Supreme Court's decision in *Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), created complex fee issues relating to settlements that could not be adequately addressed in the absence of a written fee agreement.

First testified that a third feature of employment cases that made written fee agreements necessary was the fact that a high percentage of such cases were lost at the summary judgment stage. He identified this factor in the course of explaining why the fee arrangement that Boyle described entering into with Frazier did not meet the standard of care.

Q. Now I want you to assume, Mr. First, that the agreement between Mr. Boyle and Mr. Frazier was Mr. Frazier would pay one hundred thousand dollars. That would cover all costs, all fees, everything.... In your opinion what kind of agreement is that?

A. In my opinion that is not a flat fee agreement, but it's an agreement to require money, a hundred thousand dollars, as an advance for legal services....

....

The standard of care in employment law and employment litigation, you know, those are not the types of agreements that lawyers enter into with clients, clients enter into with lawyers.

*Brewing Co.*, 241 Wis.2d 700, 623 N.W.2d 739 (2001).

---

2. Ultimately, the judgment in the Mackenzie case was reversed on appeal. *See Mackenzie v. Miller*

. . . .

A. In employment litigation, again unlike most civil litigation, summary judgment is a very significant event. And a significant number of cases lose at summary judgment. So when clients negotiate and communicate with their lawyer about a flat fee or some advance that may not be refundable, it's very problematic, recognizing that most cases—that many cases, in some jurisdictions most cases, are dismissed on summary judgment.

(Tr. at 153–54.)

First provided additional reasons why the arrangement described by Boyle did not comply with his duty to Frazier. One such reason was the inherent tension created when a lawyer asks a client to pay him a flat fee and advises the client that he will pay the costs of litigation out of that fee.

Q. Were there any problems, in your opinion, with having an agreement with a client in an employment case where it's flat fee and you just say a hundred thousand dollars, that will cover costs and my fees.

A. Based on the material I reviewed, in my opinion there's a problem and issue with that, because there's a conflict and a tension, when you have universal money, a hundred thousand that's the same between what's going to be legal fees for the attorney's revenue and what is going to be costs that won't go to that lawyer.

There are decisions in discovery in litigation. One decision might be whether to hire a videographer. That can be a thousand dollars to videotape a deposition. If that thousand dollars is going to come out of a straight pool of one hundred thousand dollars, then it's going to move from the legal fee revenue column to the cost column. And this is in my reports that there's a conflict and a tension when the money can either be fees or for costs. Similarly, whether to go to Minnesota to do a deposition. The time and the cost associated with that.

(*Id.* at 154–55.) First also cited the disparity in power and knowledge between a lawyer and a client as a reason why a written fee agreement was required.

Q. . . . . . Do you think there's any problem in [an] employment case telling a client it will be one hundred thousand dollars to cover fees and costs, I might need another hundred thousand dollars from you at some point in the future at my discretion, and to intend that one possibility is that in the future you would convert that to a contingent fee agreement without fully and completely explaining all the possibilities in writing?

A. Well, as the question is posed to me, there are so many ambiguities and uncertainties in that kind of a communication from a lawyer to a client. The standard of care requires the client have informed consent, and the standard of care requires in employment litigation, that situation, that that be in a written agreement, and the client with informed consent agree to it. And that there would not be any ambiguities, particularly recognizing that when the lawyer and the client are talking about the legal fee arrangement, there's quite an unlevel playing field.

The lawyer is skilled in talking with clients about attorney-client relationships from the inception. It may be the client's first or second time with the lawyer. The lawyer's skilled in communication, the lawyer's skilled in different arrangements. So for all of those reasons, it's my opinion that those types of relationships have to be in writing and the client has to be informed and then give consent.

(*Id.* at 155–56.)

First testified that an additional reason why Boyle should have entered into a written fee agreement with Frazier was the inherent tension created by the unusual situation whereby Frazier paid Boyle $100,000 and yet continued to pay Ryden on an hourly basis. First testified:

So, where you have a lawyer in terms of the question on a flat fee, a hundred thou-

sand dollars, and another lawyer working for the same client on the same case providing legal services, it is very cost advantageous to the lawyer on the flat fee, Mr. Boyle, to have the hourly lawyer perform legal services. And concomitantly it is a financial disadvantage, as I understand the question, to Mr. Frazier. Because he is paying Ms. Ryden at an hourly rate, and she keeps her records and bills him monthly. So there is, as I understand the question, a very serious tension in that arrangement.

(*Id.* at 163–64.)

First also testified that when Frazier wrote to Boyle on December 12, 1997, and February 8, 1999, expressing his understanding that Boyle was working on a contingency fee and raising questions about the arrangement, Boyle had an immediate duty to respond to each question and to clarify the nature of the relationship. He stated that Boyle had not fulfilled this duty.

Finally, First testified that Boyle's failure to clarify the fee arrangement and put it in writing caused substantial damage to Frazier in the form of greater expense. He stated:

[T]he facts as I understand from documents submitted to me, that there were seven lawyers working on the case, I believe that the case was more expensive in terms of monies required to pay out by Mr. Frazier in terms of the seven lawyers, and the fact that when the case was over, as I understand it he did not get back the money left over from the hundred thousand dollars he paid to Mr. Boyle. That financially, he was disadvantaged by the lack of agreement, by the lack of a written agreement. By the confusion and uncertainty.

(*Id.* at 196.)

Attorney Francis Croak testified as an expert for Boyle. He testified that he had long experience as a lawyer, but that he had not practiced recently in the area of employment law litigation. When asked if a lawyer representing a plaintiff in an employment case should have a written fee agreement Croak testified that he knew "of no requirement for a written agreement," (*id.* at 262), but stated that there was a requirement that a contingent fee agreement be in writing and that the supreme court rules stated that in other cases written agreements were preferable. Croak also testified that if Boyle believed that there was a misunderstanding between him and his client about the fee arrangement, he had a duty to contact the client and straighten out the misunderstanding.

## II. PROCEDURAL HISTORY

To fully explain my decision on Boyle's post-judgment motions it is necessary to specifically recount as well some of the procedural history of the case.

In his Complaint Frazier claimed that Boyle breached his fiduciary duty to Frazier, and Frazier alleged facts supporting this claim. He also alleged that Boyle had violated some of the state supreme court's rules regarding the conduct of lawyers. At the final pretrial conference, in order to determine what question would be submitted to the jury, I asked if it was relevant to whether Boyle had breached his fiduciary duty that he might also have violated supreme court rules. The parties submitted memoranda on the issue. Boyle argued that while a lawyer owed a fiduciary duty to a client, the violation of a supreme court rule did not constitute a breach of such duty. However, at no time prior to trial did Boyle make a motion to dismiss under Fed.R.Civ.P. 12(b)(6) or any other rule or a motion for summary judgment under Fed.R.Civ.P. 56.

Before trial Boyle also submitted a proposed special verdict, which asked whether he had breached his fiduciary duty by: "(a) failing to communicate the basis or rate of his fee to Frazier.... (b) ... failing to prepare a written fee agreement .... [or] (e) failing to return money belonging to Frazier." (Def.'s Pretrial Report, Ex. 3 at 3.) Boyle's proposed verdict tracked the allegations in Frazier's Complaint, which to some extent were drawn from supreme court rules.

On the morning of the first day of trial I advised the parties that I had concluded that under Wisconsin law a violation of a supreme court rule did not itself give rise to a breach of a fiduciary duty to a client. I suggested that if Boyle did not want the rules used to

give content to the breach of fiduciary duty claim, we should consider not using his proposed verdict question but, instead, one that asked whether he had breached his fiduciary duty by failing to deal honestly with or by taking advantage of Frazier.

Boyle's trial counsel, however, vigorously resisted this suggestion and insisted that the verdict question track the specific allegations in the Complaint. He argued:

[W]hat I want to put on the record, is that Count 2 of the complaint in this case is very simple and very specific. It says that defendant Boyle, in agreeing to be plaintiff's lead trial counsel, assumed a fiduciary duty to plaintiff; that he breached that duty in not reducing the terms and conditions of their fee arrangement to writing, in violation of a particular rule; that he breached his duty to plaintiff in not maintaining his one hundred thousand dollar cost advance in trust, in violation of a particular Supreme Court rule; that he breached his fiduciary duty by giving $7500 or paying $7500 to Mr. Mackenzie, and he breached his fiduciary duty in not returning all the money that he had properly spent in costs, again with regard to the specific Supreme Court ruling.

It is my position we were prepared to defend this case based on those specific facts. I understand that we are a general notice pleading state, but the specific facts of whether we were a party to plaintiff's pleading in this way or not in my judgment is irrelevant. I am just telling you as a trial lawyer, I was prepared to go forward to defend Mr. Boyle on whether he breached each of those fiduciary obligations as were alleged in this complaint.

If the case now on the eve of trial is going to become a general did he somehow put his own interests above the plaintiff's, his client's interests, we just didn't have notice of that, Judge, at all.

(Tr. at 8–9.)

At trial, Frazier's expert, First, did not rely at all on the supreme court rules as a basis for concluding that Boyle's fiduciary duty required that he fully explain the fee arrangement to Frazier and put it in writing, and that Boyle had breached this duty. In fact, at trial the only references to supreme court rules came as the result of questions by Boyle's lawyer. For example, Boyle's counsel cross-examined First as follows:

Q. So [in] every employment litigation case, there must be a written fee agreement?

A. That's my opinion, yes.

Q. And that's despite the fact that there's no at least Wisconsin Supreme Court rule that says that, is there?

A. I don't believe there is.

Q. In fact while Wisconsin Supreme Court rules suggest that written fee agreements are preferable, there's only one instance where they say they are mandatory. Isn't that true?

A. That's my understanding, yes.

Q. And that one instance is in a contingent fee case?

A. Yes, that's my understanding.

(*Id.* at 166.)

After testimony was completed I held an instruction conference and the parties agreed on a verdict similar to the one Boyle had previously submitted. The verdict included the following as Question No. 1:

Did Mr. Boyle breach his fiduciary duty to Mr. Frazier by:

(a) failing to adequately explain the fee arrangement to Mr. Frazier?

　　Answer: _____ (yes/no)

(b) failing to prepare a written fee agreement?

　　Answer: _____ (yes/no)

(c) failing to adequately safeguard and return money belonging to Mr. Frazier?

　　Answer: _____ (yes/no)

(R. 37.) Both parties put their approval of the verdict on the record:

[Plaintiff's Counsel]:　The form is fine, Your Honor.

The Court:　　　　　Defense.

[Defendant's Counsel]:　As far as the form goes, yes.

(Tr. at 466.)

However, Boyle's attorney (a different attorney than the attorney who insisted on the verdict question), then stated that:

[W]e would renew our position that the breach of fiduciary duty claim based on allegations of violations of Supreme Court rules which do not give rise to violative claims of Wisconsin law, therefore we would object to the—we had previously objected to the breach of fiduciary duty claim going forward, and we renew that objection at this time.

(*Id.* at 468.) Boyle and his counsel did not, however, move for judgment as a matter of law, did not refer to Rule 50, and did not cite any facts or law in support of the objection.

During the rebuttal portion of closing arguments, Frazier's counsel argued that Boyle was desperate for money because he had put so much time and effort into the Mackenzie case without having yet received any part of the $25 million damage award. Boyle's counsel objected, and after a conference with the lawyers outside the jury's presence, I reminded the jury that their recollection of what the evidence showed—not the statements of counsel—was controlling. When Frazier's counsel continued his argument, he retreated from his earlier statement and said he was sure that Boyle worked on other cases besides Mackenzie's, but that his need for money was well-established.

The case was submitted to the jury, and the jury found that Boyle had breached his fiduciary duty to Frazier by failing to adequately explain the fee arrangement and by failing to reduce the agreement to writing, but that Boyle did not breach any duty to Frazier by failing to adequately safeguard and return money belonging to Frazier. The jury found that both of Boyle's breaches had harmed Frazier and assessed damages in the amount of $89,000.

### III. DISCUSSION

Boyle presents several post-verdict motions and raises essentially three arguments. First, pursuant to Fed.R.Civ.P. 50(b), he moves for judgment as a matter of law on the ground that "the breach of fiduciary duty claim is impermissibly based on violations of the Supreme Court Rules." (Pl.'s Br. at 1.) Alternatively, and on the same ground but pursuant to Fed.R.Civ.P. 59(e), he moves to amend the judgment "by changing the jury's

'yes' answer to questions 1(a) and (b) and 2(a) and (b) [of the special verdict] to 'no' and dismissing the complaint." (*Id.* at 6.)

Second, pursuant to Rule 50(b), Boyle moves for judgment as a matter of law on the ground that the fact the jury answered "no" to one of the three subparts of the question whether Boyle breached his fiduciary duty to Frazier means that "the jury rejected Frazier's claim that the money he paid Boyle was an advance on costs and requires that the case be dismissed." (*Id.* at 9.) Alternatively, pursuant to Rule 59(e), Boyle moves to amend the judgment by reducing the damage award based on the equitable doctrines of quantum meruit and unjust enrichment.

Finally, pursuant to Fed.R.Civ.P. 59(a), Boyle moves for a new trial based on his contention that the closing argument of Frazier's counsel was prejudicial.

Boyle's motions must be denied for a variety of reasons both procedural and substantive.

### A. Boyle's Argument that the Jury Finding on Breach of Fiduciary Duty Claim Was Impermissibly Based on Supreme Court Rules

#### 1. Rule 50(b) Motion for Judgment as a Matter of Law

Rule 50 authorizes a court to order judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury" to reach a contrary conclusion. Fed.R.Civ.P. 50(a)(1). In order to make a post-judgment motion under Rule 50(b), a party must first make a proper motion under Rule 50(a) at the close of all the evidence. *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1139 (7th Cir.1994). A proper Rule 50(a) motion is "one that is explicitly a motion for judgment as a matter of law." *U.S. EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1286 (7th Cir.1995). The motion must specify "the law and the facts" on which it is based. Fed.R.Civ.P. 50(a)(2).

Boyle's Rule 50(b) motion is improper for several reasons. First, under Rule 50 I may set aside a jury verdict only if

there is not a legally sufficient "*evidentiary basis*" for the verdict. *Wildey v. Springs*, 840 F.Supp. 1259, 1264 (N.D.Ill.1994) (quoting Rule 50(a)(1)) (alteration in original), *rev'd on other grounds*, 47 F.3d 1475 (7th Cir.1995). Boyle's motion does not challenge the sufficiency of the evidence but attempts to raise a legal issue unrelated to the evidence. His motion amounts to an untimely motion to dismiss. *Id.*

■ Additionally, Boyle's objection at the close of testimony was not a proper Rule 50(a) motion. First, he failed to explicitly move for judgment as a matter of law as required in this circuit. *See AIC Sec. Investigations, Ltd.*, 55 F.3d at 1286. Second, he failed to "specify the law and facts" on which his request relied. Fed.R.Civ.P. 50(a)(2). He did not identify a single fact in support of his argument that Frazier's breach of fiduciary duty claim was based on Boyle's violation of a supreme court rule. By failing to make a proper Rule 50(a) motion, Boyle is not now entitled to renew such motion under Rule 50(b)(2).

■ Even if I assume that Boyle's motion challenges the sufficiency of the evidence and that he made a proper Rule 50(a) motion, his motion must still be denied, because there was more than sufficient evidence in the record to support the verdict. The standard for evaluating the sufficiency of the evidence in a diversity case is defined by federal law. *Deimer v. Cincinnati Sub–Zero Prods., Inc.*, 58 F.3d 341 (7th Cir.1995); *Mayer v. Gary Partners & Co.*, 29 F.3d 330, 335 (7th Cir.1994). Thus, a motion for judgment as a matter of law may be granted only if no reasonable jury could have reached the verdict in question. *Id.*

■ The elements of the claim are defined by state law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Where the laws of more than one state arguably apply, *Erie* requires that a federal court apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In the present case, although Wisconsin or Minnesota law could arguably apply, both parties have treated Wisconsin law as being applicable, and I will also.

■ Under Wisconsin law, a lawyer owes a fiduciary duty to a client, and such duty includes a duty of loyalty. *Olfe v. Gordon*, 93 Wis.2d 173, 182, 286 N.W.2d 573 (1980). In a suit against a lawyer for breach of fiduciary duty, expert testimony is generally necessary to establish the standard of care. *Id.* at 181, 286 N.W.2d 573. However, expert testimony is unnecessary where the dereliction is obvious. *Id.*

■ Frazier's expert, First, testified that under the circumstances of the present case Boyle had a fiduciary duty to fully explain the fee arrangement to Frazier and to reduce the agreement to writing, and that Boyle breached such duty. First based his opinion in part on certain special features of employment cases including fee shifting rules, the *Jeff D.* case and the high percentage of plaintiffs who lose at the summary judgment stage. He also based his opinion on certain facts particular to the present case including Frazier's December 13, 1997 and February 8, 1999 communications to Boyle, in which Frazier made clear that he had a different understanding of the fee agreement than Boyle and wanted Boyle to put the agreement in writing. First testified that these communications triggered an obligation on the part of Boyle to clarify issues relating to fees and to reduce the understanding to writing. First did not base either his conclusion as to the standard that Boyle was required to meet or his opinion that Boyle breached such standard on supreme court rules.

Boyle's own expert agreed that if Boyle was aware that Frazier's understanding of the fee arrangement was different from his own he was obliged to explain the arrangement to Frazier.

Thus, there was more than sufficient evidence in the record to support the jury's finding that, under the circumstances of this case, Boyle's fiduciary duty to Frazier required him to explain the fee arrangement to Frazier and to reduce it to writing, and that Boyle breached such duty. Finally, although I need not decide the issue, it is arguable that when a client asks a lawyer to put their

fee agreement in writing and the lawyer fails to do so, the breach of duty is so obvious that it does not require expert testimony. *Id.* at 182, 286 N.W.2d 573 (indicating that attorney-client relationship is one of agent to principal, and agent must follow instructions of principal).

In his motion Boyle raises the question of the relationship between violations of supreme court rules and civil liability. Prior to trial it appeared that this issue might be an important one, but that turned out not to be the case. Frazier presented no evidence that Boyle violated any rule, and Frazier's expert did not rely on the rules for his opinions. Thus, the question that Boyle discusses, while interesting, is, on the record before me, irrelevant, because the record contains ample evidence, wholly unrelated to the rules, that Boyle breached his fiduciary duty to Frazier. Moreover, even if Boyle did violate a supreme court rule, nothing in Wisconsin law provides that the conduct constituting such a violation cannot also constitute a violation of a lawyer's fiduciary duty to a client.

For the foregoing reasons Boyle's Rule 50(b) motion relating to the supreme court rules will be denied.[3]

### 2. Rule 59(e) Motion to Amend Judgment

■ On the same ground Boyle argues that, as an alternative form of relief, the judgment should be amended under Rule 59(e) "by changing the jury's 'yes' answers to questions 1(a) & (b) and 2(a) & (b) to 'no' and, thereafter, dismissing the complaint." (Def.'s Br. at 6.) Rule 59(e) authorizes me to amend a "judgment" not a verdict. The answers that Boyle asks me to amend are not part of the judgment. The judgment provides only that Frazier may recover $89,000 from Boyle. The relief that Boyle requests is not authorized by Rule 59(e).

■ Even if I treat Boyle's motion as a request to change the $89,000 damage award in the judgment to zero, the request must be denied. Rule 59(e) may be invoked if the

movant can show a manifest error of law or fact or newly discovered evidence. *Russell v. Delco Remy Div. of Gen. Motors Corp.*, 51 F.3d 746, 749 (7th Cir.1995). Boyle's argument appears to be that the judgment is based on a manifest error of law because the finding that Boyle breached his fiduciary duty to Frazier was impermissibly based on supreme court rules. As I have stated, however, Frazier proved his case without relying on the rules. Boyle's Rule 59(e) motion on this ground will, therefore, be denied.

### B. Boyle's Argument Relating to Jury's "No" Answer to Verdict Question 1(c)

#### 1. Rule 50(b) Motion for Judgment as a Matter of Law

Boyle argues that the jury's "no" answer to the question of whether he breached his fiduciary duty by "failing to adequately safeguard and return money belonging to Frazier" (R. 37), constituted a rejection of Frazier's argument that the $100,000 was an advance on costs and thus entitles him to judgment as a matter of law. For a number of reasons Boyle's motion will be denied.

As previously stated, Rule 50 authorizes a court to grant relief where the evidence is legally insufficient. *Wildey*, 840 F.Supp. at 1264. Boyle's motion fails because it is not directed at the sufficiency of the evidence.

■ Essentially, Boyle's argument is that he is entitled to relief because the jury's answer to verdict question 1(c) was inconsistent with its award of damages. But, Rule 50 does not provide a remedy for an inconsistent verdict. There is no priority among answers to verdict questions. I cannot treat one answer as the jury's "true" disposition to which other answers must be conformed. *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir.1998). Rather, if answers to verdict questions are truly inconsistent, the proper remedy is not judgment as a matter of law for the losing party but rather a new trial. *Will v. Comprehen-*

---

**3.** Because the evidence adduced at trial makes Boyle's argument concerning the rules irrelevant and because his Rule 50(b) motion fails on a variety of grounds, I need not address whether, by insisting on a verdict question derived in part from the rules and by introducing evidence at trial relating to the rules, Boyle waived the right to raise the issue.

*sive Accounting Corp.*, 776 F.2d 665, 678 (7th Cir.1985).

However, even if the answers in the present case were inconsistent Boyle would not be entitled to a new trial because he did not ask for one. Boyle failed to combine his Rule 50 motion on this ground with a Rule 59(a) motion for a new trial.

Further, even if Boyle had asked for a new trial, he waived the right to one by not raising the claim of inconsistency either before the case was submitted to the jury or when the verdict was returned, by, for example, asking that the jury be ordered to resume deliberations. Failure to object to the form or wording of a special verdict prior to its submission to the jury or when the verdict is returned results in a waiver of the right to object later. *See Grove Holding Corp. v. First Wis. Nat'l Bank*, 12 F.Supp.2d 885, 899 (E.D.Wis.1998); *see also Sims v. Mulcahy*, 902 F.2d 524, 533–36 (7th Cir.1990); *In re Innovative Constr. Sys., Inc.*, 793 F.2d 875, 882 (7th Cir.1986) (citing Fed.R.Civ.P. 51 for the statement that "by failing at trial to object to the wording of the special interrogatories it waived any objections it might have had thereto"); *cf.* Fed.R.Civ.P. 49, 51. Waiver is especially likely to be found when the party presently complaining of a special verdict question participated in drafting it. *Grove Holding Corp.*, 12 F.Supp.2d at 899.

Finally, the jury's answer to question 1(c) is not inconsistent with its damage award. If there is a view of the case that harmonizes the jury's answers I am obliged to adopt it. *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). In the present case the jury's answers may be easily harmonized in several ways. The jury could have concluded that Boyle and Frazier never entered into a valid contract because there was no meeting of the minds as to its terms. Under this view the funds Frazier provided to Boyle would not have been an advance on costs, and Boyle would not have been required to "safeguard" them. Yet the jury could also have concluded that Boyle served as Frazier's lawyer and breached his fiduciary duty to him.

The answers can also be harmonized by inferring that the jury concluded that the $100,000 was an advance on costs but that Boyle did not fail to "safeguard" it because he had sufficient funds to reimburse Frazier in whatever amount was required. Boyle, in fact, made this argument at trial.

Finally, a damage award need not be vacated if the jury's intent was clear. *See Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1401–02 (7th Cir. 1997). In the present case the jury found that Boyle breached his fiduciary duty to Frazier and awarded damages to Frazier. Its intent was crystal clear.

For all of the foregoing reasons Boyle's Rule 50(b) motion for relief based on the jury's answer to question 1(c) will be denied.

**2. Rule 59(e) Motion to Amend Judgment**

On the same ground Boyle argues that, as an alternative form of relief, pursuant to Rule 59(e), I should amend the judgment by reducing the damage award. He argues that the damage award should be reduced to ensure that Boyle receive the reasonable value of his services (quantum meruit) and/or to prevent Frazier from being unjustly enriched. As previously stated, a Rule 59(e) motion may be granted on the ground of manifest error of law or fact or of newly discovered evidence. *Russell*, 51 F.3d at 749. However, it is not a vehicle by which the losing party may raise novel legal theories that the party had the ability to address in the first instance. *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986).

Boyle's request for relief under Rule 59(e) fails for a number of reasons. First, in invoking the concepts of quantum meruit and unjust enrichment Boyle is raising new theories that should have been raised earlier. He presented no evidence or argument at trial concerning the reasonable value of his services or those of Whitcomb or Mackenzie. Similarly, he presented no evidence or argument concerning the theory of unjust enrichment. Thus, these theories may not now be raised by a Rule 59(e) motion.

 Finally, even if I assume that his arguments are properly before me, I find them to be without merit. Boyle's quantum meruit and unjust enrichment arguments both amount to a contention that the damage award was excessive. When liability is determined by state law, state law governs the substantive assessment of whether the evidence supports the damages awarded. *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Medcom Holding Co.*, 106 F.3d at 1397. Thus, I apply Wisconsin law to the issue. Under Wisconsin law an award of damages must be supported by credible evidence. *Reyes v. Greatway Ins. Co.*, 220 Wis.2d 285, 582 N.W.2d 480 (Ct.App.1998), *aff'd*, 227 Wis.2d 357, 597 N.W.2d 687 (1999).

In the present case the damage award was supported by substantial credible evidence. Boyle presented no evidence of the reasonable value of his services or those of Whitcomb or Mackenzie. Apparently none of the three maintained any time slips in connection with Frazier's case. Moreover, the jury could have reasonably concluded that all three were vastly overpaid. Boyle paid Whitcomb $48,500, but Whitcomb's involvement consisted of taking two depositions and participating in several conferences. Boyle also paid Mackenzie $7,500 in advance for anticipated paralegal work, surely an unusual way of compensating a paralegal. Further, there was evidence suggesting that Boyle's payments to Whitcomb and Mackenzie arose more from his feelings about their involvement in Mackenzie's case than from their work in Frazier's case.

It is also not clear what services Boyle performed for the $20,000 that he retained. He took no depositions and wrote no briefs. He also spent $3,000 on a mock jury trial, even though the judge had advised the parties that the case would likely be dismissed at the summary judgment stage. The jury could reasonably have concluded that this was a wholly wasteful expenditure of funds. Thus, even if Boyle's quantum meruit argument was properly before me, it is without merit.

Boyle's argument that the jury verdict would unjustly enrich Frazier is similarly unpersuasive. The jury could have reasonably concluded that Boyle's participation in Frazier's case was of no value to Frazier. Boyle's skill was as a courtroom advocate. He had no particular expertise in employment law. He was not a taker of depositions or a writer of briefs. If the case had gotten to trial, Boyle's participation might have been of great benefit to Frazier. Unfortunately for both Frazier and Boyle, the case never got to that point. In the posture that the case was in when Boyle participated in it, the reality was that he had little to offer Frazier.

For the foregoing reasons Boyle's motion to amend the judgment pursuant to Rule 59(e) will be denied.

## C. Boyle's Argument That Frazier's Counsel's Closing Argument was Improper

Finally, Boyle argues, pursuant to both Rules 59(a) and 60(b) that he is entitled to a new trial based on Frazier's counsel's inflammatory rebuttal argument. Boyle argues that the trial was unfair to him because Frazier's counsel argued in rebuttal that Boyle was desperate for money because he had put so much time and effort into the Mackenzie case without having yet received any part of the $25 million damage award.

 The Seventh Circuit holds that the key factor in determining whether a substantive motion is cognizable under Rule 59 or Rule 60 is its timing. *United States v. Deutsch*, 981 F.2d 299, 301 (7th Cir.1992). If the motion is made within ten days of the judgment, as Boyle's was, it is analyzed under Rule 59. *Britton v. Swift Transp. Co.*, 127 F.3d 616, 618 (7th Cir.1997).

 Rule 59(a) authorizes me to grant a new trial "for any of the reasons for which new trials [or rehearings] have heretofore been granted in actions at law [or in suits in equity] in the courts of the United States." Irrespective of whether a federal court is exercising federal question or diversity jurisdiction, its standard of review in deciding a new trial request must be based on federal law. *Jackson v. Bunge Corp.*, 40 F.3d 239, 244 (7th Cir.1994).

Under federal law, a motion for a new trial is addressed to the sound discretion of the trial judge. *Fort Howard Paper Co. v. Standard Havens, Inc.,* 901 F.2d 1373, 1377 (7th Cir.1990). The Seventh Circuit has recognized that a new trial may be granted in three instances: "(1) the verdict is against the clear weight of the evidence; (2) the damages are excessive; or (3) the trial was unfair to the moving party." *Allison v. Ticor Title Ins. Co.,* 979 F.2d 1187, 1196 (7th Cir. 1992). Improper statements during closing arguments warrant reversal only if they "influenced the jury in such a way that substantial prejudice resulted to" the opposing party. *Arcor, Inc. v. Textron, Inc.,* 960 F.2d 710, 713 (7th Cir.1992) (quoting *Fenolio v. Smith,* 802 F.2d 256, 258 (7th Cir.1986)).

The statement to which Boyle objects did not result in substantial prejudice to him for two reasons. First, the record contained evidence that Boyle had put in a lot of time on the Mackenzie case and was in difficult financial straits. Boyle testified that he was in need of money, and that he and Mackenzie had borrowed some $400,000 from a venture capital firm to take care of their obligations. As collateral for this loan, Boyle acknowledged that he was required to put up his life insurance, his wife's inheritance and some of the potential Mackenzie award. Thus, Frazier's counsel's remark was barely an exaggeration.

Second, substantial evidence in the record supported the jury's conclusion that Boyle breached his fiduciary duty to Frazier. In the context of the entire case the remark to which Boyle objects was of little significance. For this reason also the statement of Frazier's counsel did not cause substantial prejudice to Boyle.

Thus, Boyle's motion for a new trial pursuant to Rule 59(a) will be denied.

### IV. CONCLUSION

For the reasons stated, **IT IS HEREBY ORDERED** that Boyle's post-judgment motions are **DENIED.**